OPINION
{¶ 1} Appellant-appellant, 18121 Euclid, Inc. dba Convenient Food Mart, appeals from a judgment of the Franklin County Court of Common Pleas that affirmed an order of the Ohio Liquor Control Commission ("commission") denying appellant's request for a liquor permit. For the following reasons, we affirm the judgment of the common pleas court.
 {¶ 2} On August 15, 2003, through Riyad Herbawi, who is the president of 18121 Euclid, Inc., and the corporation's sole shareholder, appellant applied for a new C-1-2 liquor permit. The Cleveland City Council opposed issuance of a liquor permit to appellant. On February 17, 2004, at the request of the Cleveland City Council, the Division of Liquor Control held a hearing to consider appellant's application.
 {¶ 3} Finding that issuing a liquor permit to appellant would substantially interfere with the public decency, sobriety, peace, or good order, the Superintendent of the Division of Liquor Control ("superintendent") denied appellant's application pursuant to R.C. 4303.292(A)(2)(c). In her order, the superintendent noted that the previous operation of a beer and wine carryout store at the same location by a different owner was the source of many community problems. The superintendent further noted that the neighborhood in which appellant's store was located was undergoing revitalization, and residents were concerned that issuing a liquor permit to appellant would be detrimental to revitalization efforts. From the superintendent's order, appellant appealed to the commission, which held a hearing on August 10, 2004, to consider appellant's appeal. After considering the evidence before it, the commission affirmed the order of the superintendent.
 {¶ 4} From the commission's order, appellant timely appealed to the common pleas court. Finding that the commission's order was supported by reliable, probative, and substantial evidence, and that the commission's order was in accordance with law, the common pleas court affirmed the commission's order. From the common pleas court's judgment, appellant now appeals and assigns a single error for our consideration:
THE DECISION OF THE FRANKLIN COUNTY COURT OF COMMON PLEAS TO AFFIRM THE ORDER OF THE LIQUOR CONTROL COMMISSION DENYING THE APPLICANT A PERMIT IS NOT SUPPORTED BY RELIABLE, PROBATIVE AND SUBSTANTIAL EVIDENCE AND IS NOT IN ACCORDANCE WITH LAW.
 {¶ 5} Pursuant to R.C. 119.12, when a common pleas court reviews an order of an administrative agency, it must consider the entire record to determine whether the agency's order is supported by reliable, probative, and substantial evidence and is in accordance with law. Univ. of Cincinnati v. Conrad (1980),63 Ohio St.2d 108, 110-111; see, also, Andrews v. Bd. of LiquorControl (1955), 164 Ohio St. 275, 280. The common pleas court's "review of the administrative record is neither a trial de novo
nor an appeal on questions of law only, but a hybrid review in which the court `must appraise all the evidence as to the credibility of the witnesses, the probative character of the evidence, and the weight thereof.'" Lies v. Ohio VeterinaryMed. Bd. (1981), 2 Ohio App.3d 204, 207, quoting Andrews, at 280. In its review, the common pleas court must give due deference to the administrative agency's resolution of evidentiary conflicts, but the findings of the agency are not conclusive. Conrad, at 111.
 {¶ 6} An appellate court's review of an administrative decision is more limited than that of a common pleas court. Ponsv. Ohio State Med. Bd. (1993), 66 Ohio St.3d 619, rehearing denied 67 Ohio St.3d 1439. In Pons, the Supreme Court of Ohio instructed:
* * * While it is incumbent on the trial court to examine the evidence, this is not a function of the appellate court. The appellate court is to determine only if the trial court has abused its discretion, i.e., being not merely an error of judgment, but perversity of will, passion, prejudice, partiality, or moral delinquency. Absent an abuse of discretion on the part of the trial court, a court of appeals may not substitute its judgment for [that of an administrative agency] or a trial court. Instead, the appellate court must affirm the trial court's judgment. * * *
Id. at 621.
 {¶ 7} An appellate court does, however, have plenary review of questions of law. Chirila v. Ohio State Chiropractic Bd.
(2001), 145 Ohio App.3d 589, 592, citing Steinfels v. Ohio Dept.of Commerce, Div. of Securities (1998), 129 Ohio App.3d 800,803, appeal not allowed (1999), 84 Ohio St.3d 1488.
 {¶ 8} At the hearing before the commission, the following witnesses testified: (1) Detective Eugene Jones, a detective in the vice unit for the Cleveland Division of Police; (2) Roosevelt Coats, a Cleveland City Council member; (3) Catherine Puckett, executive director of Euclid-St. Clair Development Corporation; (4) Gloria Grady, a school crossing guard at a school that is nearby the proposed liquor permit premises; (5) Elena Walker, a school crossing guard and co-worker of Ms. Grady; (6) Riyad Herbawi, president of 18121 Euclid, Inc.; (7) and C. William Leftwich, a business associate of Mr. Herbawi in an unrelated business.
 {¶ 9} Detective Eugene Jones testified that when the prior liquor permit was in effect, the police department received daily complaints related to drug activity, prostitution, and liquor sales at the site of the store. (Tr. 8.) However, according to Detective Jones, since renewal of the last liquor permit was denied, there had been a marked decrease in the amount of complaints from a two-to-three block area where the store is located. (Tr. 9.) Furthermore, because renewal of the former liquor permit had been denied, the police were not required to do any liquor investigations at the site of the store. (Tr. 9.) Detective Jones testified that the store's new owner had done a very good job at keeping loitering and drug activity away from the store's parking lot (Tr. 10), and that at the store there was a "normal level of loitering and drug activity and prostitution that they would have anywhere on Euclid Avenue." (Tr. 11.) Detective Jones also testified that he "wouldn't see any harm in them having a permit and seeing how it works" (Tr. 10), and that he would not have a personal objection to the issuance of a liquor permit to appellant. (Tr. 10, 11.) When queried whether, based upon his professional experience as a police officer, he would expect problems at the store's location if a liquor permit were issued, Detective Jones testified:
You, know, I can't — there will be a certain — if they obtain a liquor permit, that means that their business is going — there is going to be an increase in business, and we'll have to do what we normally do with any permit premises, that is, every six to nine months we'll send minors in to attempt to make controlled purchases, we'll investigate council member complaints or if we receive any kind of complaints, we'll investigate them.
Business will increase, but that doesn't mean that the level of drug activity or prostitution activity will increase. If he starts selling pipes or drug paraphernalia, then of course he's going to track [sic] a certain kind of element and a certain people to the permit premises, but just based on the fact that he has a liquor permit means that there's going to be an increase in business.
(Tr. 12-13.)
 {¶ 10} Roosevelt Coats, a city council member for 16 years, testified that when the previous liquor permit was in effect, there were problems with the sale of alcohol to minors, drug trafficking in and out of the store, and prostitution. (Tr. 14.) Mr. Coats testified that since liquor sales at the store had stopped, the "environment" had improved somewhat. (Tr. 15.) Mr. Coats further testified that, in his professional capacity, he was "pretty sure" that problems would increase if liquor sales were permitted at the store's location. (Tr. 15.) When questioned whether businesses would leave the area where the store is located if the environment did not continue improving, Mr. Coats testified:
* * * I have a task as a councilman, and the community development organization has a task, to clean up that area. We've already started to do that, by building houses and building up the community, and going to build a new school, but if we're not able to control the social problems, many of the businesses have indicated that they are leaving.
(Tr. 16.)
 {¶ 11} On cross-examination, Mr. Coats testified as follows:
Q. [By appellant's counsel] Do you think that all the improvement is because of the lack of the permit? And basically what you're saying is, I don't want to put words in your mouth, but you're saying that everything, the area is okay now or the store is okay now, but if they got the permit back again, then these same things would occur again, correct?
A. That's always the possibility, but as I look at this sheet I have in front of me, we have twenty establishments within a one-mile radius. Twenty-one would increase that social problem in my view, and that's something that we the community cannot afford.
(Tr. 18.)
 {¶ 12} Catherine Puckett, the executive director of Euclid-St. Clair Development Corporation, testified that she was familiar with the store premises as she lived three-fourths of a mile away from the store and her office was about two blocks away from the store. (Tr. 26.) Ms. Puckett testified that when the former owner owned the store there were problems with loitering in the parking lot and debris. (Tr. 26-27.) Since ownership of the store changed, the premises were "a bit cleaner," but there was still loitering. (Tr. 27.) Ms. Puckett testified that even since the change in ownership, she has continued to receive complaints about drug sales in the parking lot. (Tr. 27-28.) Ms. Puckett also testified that it would not be beneficial to the area if a liquor permit were issued to appellant, and she also testified that there are many places in the area "within a block or so" that sold liquor. (Tr. 28.) According to Ms. Puckett, even though ownership of the store had changed, young girls have complained that loiterers still harass them. (Tr. 29-30.) According to Ms. Puckett, since the store changed ownership, the store is "a bit cleaner, it appears to be a bit cleaner, but I've not noticed any major difference, no." (Tr. 30-31.)
 {¶ 13} Gloria Grady testified that she is a school crossing guard at a school that is located about one-half block away from the store and her guard post is approximately three blocks away from the store. (Tr. 31-33.) Ms. Grady also testified that she does not live far away from the store. (Tr. 33.) Ms. Grady further testified that she was a member of the Euclid Park Civic Club and the Euclid-St. Clair Coalition, as well as other organizations. (Tr. 32.) According to Ms. Grady, in her official capacity as a member of community organizations, she has received complaints from residents about the store. (Tr. 32-33.) Ms. Grady described the current operation of the store as follows:
* * * By me living in the area about 27 years, yes, I'm up and down the hill all the time. And you see it right there in the parking lot, they congregate there, several cars parked there, doing their business.
I have taken — I haven't been inside the store myself, but I have taken people to the store. And you sit out there in your car and you see transactions going on, drug transactions.
(Tr. 34.)
 {¶ 14} When queried about the cleanliness of the store's premises, Ms. Grady testified:
It still needs some work. I mean, there has been some improvement, but it still needs work. There's broken glass, I mean, I don't know. He's not selling beer and stuff, I don't think, he's not supposed to, but the bottles are still out there, broken glass. They set them down, like I say, they'll set them down in the street, in the lane, when the car is stopped, they open up the door and set down bottles. There are still broken bottles and glass in the area, trash.
(Tr. 34-35.)
 {¶ 15} Ms. Grady admitted, however, that the store's parking lot was less congested since the store's change in ownership. (Tr. 39.) She also testified that there were several other places in the immediate area to obtain liquor. (Tr. 35.)
 {¶ 16} Elena Walker testified that she was retired but she also worked as a school crossing guard at the same school at which Ms. Grady works. (Tr. 42.) According to Ms. Walker, she has lived two blocks away from the store for approximately 24 years. (Tr. 43.) Ms. Walker described the current condition of the store's premises as follows:
There's a lot of loitering around there, you can't hardly get in, you know, they're asking you if you're straight, like that. You know, it's still pretty clean, better than it was before, but there's a lot of people, kids hanging around out in front, can't hardly get in the door. Catching you when you're walking up, and asking you are you straight.
(Tr. 43.)
 {¶ 17} Ms. Walker testified that when kids asked "if you are straight," this query indicated that these persons wanted to sell drugs. (Tr. 45.) Ms. Walker testified:
Well, they ask me, ma'am, are you straight, you know, are you straight, and I got sense enough to know that's what they mean. And I have saw them coming up there with — when other people's coming up there and they ask you, sitting over in the car or truck, I mean they're selling because they're exchanging money.
(Tr. 45-46.)
 {¶ 18} Riyad Herbawi testified that he is the president of 18121 Euclid, Inc., the corporation's sole shareholder, and also the store's manager. (Tr. 47-48.) Mr. Herbawi testified that for 15 years he had been associated with stores that had liquor permits as either an owner or manager. (Tr. 48.) Mr. Herbawi also testified that neither the Liquor Department nor the commission had previously cited him for any violations, and that he has not had any difficulty with the law. (Tr. 49.) According to Mr. Herbawi, he has owned the store for approximately 20 months and had no relationship with the previous owners. (Tr. 49.) Mr. Herbawi testified that since acquiring ownership of the store, he has made physical improvements to the store and that he is a franchisee of Convenient Food Mart. (Tr. 51.) Mr. Herbawi also testified about his efforts at confronting those persons who were selling drugs at his store. (Tr. 52-54.) Mr. Herbawi testified that after the first four months of operation, he has not had any problems with loiterers or people causing trouble. (Tr. 54.) Mr. Herbawi disputed Ms. Walker's and Ms. Puckett's claims that drug dealing was occurring in the parking lot of his store. (Tr. 56.) When asked whether drug dealing was occurring in the store's parking lot, Mr. Herbawi testified: "Not really." (Tr. 56.) Mr. Herbawi also disputed the claim that liquor was conveniently available to potential customers at nearby locations. Mr. Herbawi testified:
I look at it this way: The stores around is not convenient to this location. Like there's a liquor store way deep in the plaza, inconvenient for people. And there's a store on the right side which is like three blocks away, no parking lot, and hardly open, different time, one day open, one time not.
(Tr. at 57.)
 {¶ 19} C. William Leftwich, a business associate of Mr. Herbawi in an unrelated business, testified that he is familiar with the neighborhood where the store is located. (Tr. 61.) Mr. Leftwich described the previous store's operation as "a rather grab-the-money-and-go type operation, where everything was allowed to take place from the parking lot to the front door, and it was almost impossible to gain entry into the building without being approached by drug dealers of the community." (Tr. 61-62.) According to Mr. Leftwich, since Mr. Herbawi reopened the store, the store is:
* * * [A] clean, well run, strictly business operation with no, none of the previous individuals around there taking any of that type of operation. Most of his clientele is elderly. There are a few children that come in and buy candy, but for the most part, the lottery seems to be the biggest draw into that store, as opposed to what was like in the past.
(Tr. 62.)
 {¶ 20} Mr. Leftwich testified that he comes into the store on average of "three to four times a week," and his visits to the store are "from two to four hours a time per visit." (Tr. 62-63.) On cross-examination, upon inquiry as to why he was at the store for two to fours hours at a time, Mr. Leftwich testified: "I have another business unrelated to the convenient operation with Mr. Herbawi, which is an entertainment business with a record label." (Tr. 64.)
 {¶ 21} R.C. 4303.292(A)(2)(c)[1] provides that the Division of Liquor Control may refuse to issue a liquor permit if it finds that it would substantially interfere with public decency, sobriety, peace, or good order with respect to the neighborhood where the proposed liquor permit premises is located. See, also, Ohio Adm. Code 4301:1-1-12(B)[2]
(providing that in determining whether to grant a liquor permit application the division shall consider environmental factors that affect the maintenance of public decency, sobriety, and good order, including the amount and location of permit premises in the immediate area).
 {¶ 22} In Our Place, Inc. v. Ohio Liquor Control Comm.
(1992), 63 Ohio St.3d 570, the Supreme Court of Ohio instructed:
The evidence required by R.C. 119.12 can be defined as follows: (1) "Reliable" evidence is dependable; that is, it can be confidently trusted. In order to be reliable, there must be a reasonable probability that the evidence is true. (2) "Probative evidence is evidence that tends to prove the issue in question; it must be relevant in determining the issue. (3) "Substantial" evidence is evidence with some weight; it must have importance and value.
Id. at 571. (Footnotes omitted.)
 {¶ 23} In Bagley Interstate 71 Ent., Inc. v. Ohio LiquorControl Comm., Franklin App. No. 03AP-720, 2004-Ohio-1063, this court stated:
Since Our Place, this court has revisited the question of what evidence is reliable, probative or substantial when a new permit is sought. Although [Service Station Holdings, Inc. v.Liquor Control Comm. (June 27, 1996), Franklin App. No. 96APE01-22, appeal not allowed, 77 Ohio St.3d 1492 ("ServiceStation Holdings I")] * * * and other cases have held that unsubstantiated fears or speculation regarding the impact a liquor license would have upon the surrounding community are not sufficient evidence that the issuance of the permit would interfere with public interests, this court also has recognized that evidence presented in opposition to applications for new permits, is, by definition, more speculative than evidence in cases of permit renewal or transfer applications. See SM AM,Inc. v. Ohio Liquor Control Comm. (May 22, 2001), Franklin App. No. 00AP1-298.
Id. at ¶ 10.
 {¶ 24} In Service Station Holdings, Inc. v. Ohio LiquorControl Comm. (Feb. 20, 1997), Franklin App. No. 96APE08-1053 ("Service Station Holdings II"), the evidence showed that a high school was located on another corner of a gas station's already busy intersection and that increased traffic generated by the availability of alcohol at the gas station would create a hazard to students that attended the high school near the gas station. Affirming the judgment of the common pleas court, theService Station Holdings II court found that the testimony in that case "[was] not general, speculative evidence applicable as an argument against most permit applications. It is specific testimony of the current situation, past accidents at that location, and the significant interference with the public order that has already occurred and is reasonably likely to be exacerbated by the granting of the requested permit." Id.
 {¶ 25} In Maggiore v. Ohio Liquor Control Comm. (Mar. 29, 1996), Franklin App. No. 95APE06-713, this court observed that "[i]n a neighborhood that is declining and is combating such decline, public drinking and negative behavior linked to liquor such as congregating to drink and routine incidents of public urination can be viewed as substantially interfering with public decency, sobriety, peace, and good order." Id.
 {¶ 26} Here, based upon our review of the record, we conclude that: (1) the specific testimony concerning the presence of loitering, drug dealing, and debris that presently exists at the store despite appellant's efforts at remedying these problems; (2) the reasonable likelihood these present conditions will be exacerbated by the granting of the requested permit; and (3) the testimony about significant interference with the public order that existed when this location was last granted a liquor permit within the recent past, constitutes reliable, probative, and substantial evidence to support the commission's order. See, e.g., Service Station Holdings II, supra; Maggiore, supra.
 {¶ 27} Furthermore, because pursuant to R.C.4301.10(A)(2)[3] the Division of Liquor Control has authority to deny an application for a liquor permit and because pursuant to R.C. 4301.04(B) the commission has authority to consider, hear, and determine all appeals authorized by R.C. Chapters 4301 and 4303, the commission had authority to affirm the decision of the Dvision of Liquor Control.
 {¶ 28} To support its claim that the common pleas court erred by affirming the commission's order, appellant relies upon ShotzBar Grill, Inc. v. Ohio Liquor Control Comm., Franklin App. No. 02AP-1141, 2003-Ohio-2659. Appellant's reliance upon Shotz,
however, is inapposite. In Shotz, in March 2001, the corporation's bookkeeper and financial manager entered a guilty plea to a felony of conspiring to impede and impair the Internal Revenue Service after failing to pay her own taxes. Shortly after the bookkeeper entered her guilty plea, the bookkeeper's services for the corporation were terminated. After the bookkeeper's services were terminated, the commission revoked the corporation's liquor license. On appeal, finding no nexus between the bookkeeper's felonious activity and the liquor permit or permit premises, this court sustained appellant's sole assignment of error and reversed the judgment of the common pleas court. Id. at ¶ 39. In Shotz, this court observed:
This court is aware of Henry's Café v. Bd. of Liquor Control
(1959), 170 Ohio St. 233. * * * We have repeatedly followedHenry's Café, while repeatedly urging the Ohio Supreme Court to revisit the holding. However, we are not confronted here with a choice between penalties meted out by a state agency. Instead, we are presented with the question of whether any penalty whatsoever can be handed down where no tie has been demonstrated between the felonious conduct and the liquor permits or permit premises. Thus, we do not feel that Henry's Café governs the outcome of this case.
Id. at ¶ 38.
 {¶ 29} Shotz is distinguishable from this case. Shotz
concerned an appeal from a license revocation, not a denial of an application for a liquor permit, as is the case here. Moreover, this case does not concern "whether any penalty whatsoever can be handed down where no tie has been demonstrated between the felonious conduct and the liquor permits or permit premises." Id. at ¶ 38. Rather, this case resolves to determining whether there is reliable, probative, and substantial evidence to support the finding that issuing a liquor permit to appellant would substantially interfere with the public decency, sobriety, peace, or good order of the neighborhood where the proposed permit premises is located. Accordingly, appellant's reliance uponShotz is not well-taken.
 {¶ 30} Since this case was argued before this court, this court issued Meslat v. Ohio Liquor Control Comm., Franklin App. No. 05AP-318, 2005-Ohio-5491. In Meslat, Mohammed D. Meslat appealed from a judgment of the common pleas court affirming an order of the liquor commission denying his application for new C-1 and C-2 liquor permits. Reversing the judgment of the common pleas court, the Meslat court found:
* * * [T]he city failed to present reliable, probative, and substantial evidence regarding the environmental factors. All the testimony related to problems that occurred at that location five years ago when the premises were operated under different ownership; and while the problems that existed then have moved to another area of town, there are no problems at the location now, despite the fact that two businesses are currently being operated in the plaza. Further, the testimony revealed that another business in the area, the 7-Eleven, is operating with a liquor permit but does not have the loitering problems, with the success being attributed to the 7-Eleven's current ownership. Detective Pillow's testimony established that any business located on a corner had the potential to become a place for loitering and that while loitering may be aided by a liquor permit, it was not caused by the presence of a liquor permit.
Id. at ¶ 21.
 {¶ 31} This case, however, is factually distinguishable fromMeslat. Unlike Meslat, wherein this court found all the testimony related to problems that previously occurred at the location five years before when the business operated under different ownership and there were no present problems at the location, Meslat, at ¶ 21, in this case there is evidence that loitering, drug dealing, and debris, such as broken bottles and glass, remain problematic at the store despite appellant's efforts at remedying these issues. Furthermore, unlike Meslat,
the store in this location has been without a liquor permit only since August 9, 2002,[4] which is substantially less than the five-year period as in Meslat. See Meslat, at ¶ 16 (stating that city councilman Roosevelt Coats testified that there were problems with loitering when the previous business held a liquor permit five years before).
 {¶ 32} Accordingly, under the facts and circumstances of this case and for the reasons stated above, we therefore conclude that the common pleas court did not abuse its discretion when it found that reliable, probative, and substantial evidence supported the commission's order, and that the commission's order was in accordance with law.
 {¶ 33} However, notwithstanding our conclusion, we acknowledge that appellant, through Mr. Herbawi, apparently has taken affirmative steps to decrease littering, loitering, and drug dealing in the parking lot of the store, and the result in this case may require appellant to shoulder a substantial burden for community problems that it may be powerless to solve. Absent an abuse of discretion by the common pleas court, however, we cannot substitute our judgment for that of the common pleas court or the commission. See Pons, at 621; see, also, Right Now MiniMarket, Inc. v. Ohio Liquor Control Comm., Franklin App. No. 04AP-914, 2005-Ohio-1125, at ¶ 14.
 {¶ 34} Finding no abuse of discretion by the common pleas court, we therefore overrule appellant's sole assignment of error and affirm the judgment of the Franklin County Court of Common Pleas.
Judgment affirmed.
Sadler and Travis, JJ., concur.
[1] Appellant applied for a liquor permit on August 15, 2003. While appellant's appeal before the commission was pending, (2004) Am.Sub.H.B. No. 306 amended R.C. 4303.292 and made non-substantive changes to R.C. 4303.292(A)(2)(c), effective July 23, 2004.
[2] Following submission of appellant's application for a liquor permit, Ohio Adm. Code 4301:1-1-12 was revised, effective March 25, 2004. 2003-2004 Ohio Monthly Record 2396. However, Ohio Adm. Code 4301:1-1-12(B) was not substantively changed by this revision.
[3] Since appellant applied for a liquor permit in August 2003, R.C. 4301.10 was amended by (2004) Am.Sub.H.B. No. 306 and (2005) Am.Sub.H.B. No. 66. Although (2004) Am.Sub.H.B. No. 306 amended division (A)(2) of R.C. 4301.10, the authority of the Division of Liquor Control to deny an application for a liquor permit was not affected by this legislation.
[4] According to a certification by the Superintendent of the Division of Liquor Control, Ohio Department of Commerce ("division"), the store held a class C1-2 D6 permit from 1975 until August 9, 2002. On May 15, 2001, the division denied an application of renewal for this permit. Effective June 25, 2002, this permit was revoked and, on August 9, 2002, the division canceled the permit.